Good morning. Hey, please, the Court. My name is Kevin Love. I represent the appellant, Criden and Love, in this case. As an initial matter, I apologize up front that I might have to ask you to repeat yourself. I am hard of hearing, and I've heard most of what you've said in the gallery, but not all of it. Back in 2012, Mr. Saveri called me and told me that he was leaving his firm, Leaf Cabraser. He was going to start a new firm, and we had referred several clients to Leaf Cabraser, and Mr. Saveri was working on many of those cases. In that conversation, the case of titanium dioxide came up, and he said that he wanted to continue doing what he was doing in that case at his new firm. I said, what do you mean? He said, well, there are two leads right now, Bill Bennett and Leaf Cabraser, and when I start my new firm, I want that to be the third lead. I said, great, but understanding that I had a referral fee with Leaf Cabraser, and that any work that he would have done at Leaf Cabraser, I would have gotten, or my firm would have gotten a referral fee, just because he was moving to the next firm and working on the case, and considering he was getting that position because of the initial referral, I said, great, if you move for lead counsel while you represent my client, Isaac Industries, then we would expect you to pay the same type of referral fee that Leaf Cabraser is paying. He did not say yes, he did not say no. We continued talking about other cases, and the call ended. In fact, you were paid for the work. I'm sorry? You were paid for the work that was done by Leaf Cabraser. I was paying for the work? No. The firm received the referral fee for the work done by Leaf Cabraser. We were paid by Leaf Cabraser the referral fee, absolutely, no question of that. Two and a half million dollars. Over a million dollars, yes. Pardon me? It was, I believe, 12 and a half percent of their fee, and I think it was around a million dollars. We also got paid a referral fee by Berger Monte. They also wrote our client. And then, of course, we got paid our hours. There's no question on that. The question is whether Mr. Civeri and his firm owe us a referral fee for all the work that he did at his new firm. So what is the basis of your claim here? It's a contract claim, right? Exactly. Okay. So I'm having problems finding where the consideration would be for this contract. The consideration in referral fees is referring the client. So if he's going to use my client, and then in that case, and in this situation it was, if you're going to move for lead counsel while representing my client, I will expect you to pay that fee. Now, he had an easy out. All he had to do was withdraw from representation. Or another thing he could do was not accept the contract, which is what you have said. He didn't. He didn't accept it, did he? What you say is he didn't accept it. He says he didn't accept it. He didn't deny it, but he didn't accept it. He didn't accept it in the phone call. Did he ever accept it? Yes, he accepted it by the conduct. No. California law is clear. No. So if you make an offer, and then the conduct matches what that offer is, then that's an acceptance. If it's reasonable for the other party to believe that that conduct was an acceptance, it doesn't matter what's in that person's mind. That's an acceptance. Even if it's illegal? There are just all sorts of problems here. I mean, it doesn't appear, is it undisputed? Did Saveri ever appear specifically on behalf of Isaac? Yes. He appeared on behalf of this group, in this group of plaintiffs, in this group of. . . When Leith Cabrera filed the complaint, and Mr. Saveri was part of that, and he was on the signature block, he said, I represent Isaac Industries. He never withdrew from that. He was a co-lead class counsel in this litigation. Class counsel doesn't change the fact that you represent a client. When you file a class action complaint, it says, I represent X client individually and as a class rep. It's important. Well, is there any discussion in this telephone call about consent to lead counsel status? In the call. . . Well, that's what we're basing this all on, this implied contract that came from this call. No, Your Honor. I mean, that was the offer. That was the offer. The conduct came later. Mr. Saveri went to his new firm. But you told me that acting as lead counsel was the consideration, allowing him to do that. Is there anything in this record that you could have kept him from doing that? No, but he could have withdrawn my client. He could have what? He could have withdrawn from reference. He could have. But is there any reason why he should? Has he offered anything for that? He doesn't have the right to represent my client if my client and I do not want him to represent. I see. And your client told him that he didn't want him to represent him. Through me, yes. You told him you're not to represent him unless I get. . . I read and I credit you for giving an honest rendition of these calls. But that's not what you said in the call. You said you'd expect it. And he didn't say yes and he didn't say no. Exactly, Your Honor. I said, I expect you to pay the referral. . . And you didn't say to him, you can't represent him unless you do this. And I want a response now. Even then, I don't know that. . . No, I did not say that. But I said, I expect if you move for lead counsel representing my client, you'll pay the referral fee. And that's exactly what he did. And that's not our only claim, Your Honor. Even if there's not a contract. We have an unjust enrichment claim that if there is no contract, the fact of the matter is, he never would. . . He did service lead counsel. I'm sorry? He did service lead counsel. He never charged Leif Cabresa for any of the work that he did after he left the firm. You were compensated for your referral, for the referral that you made, to the firm you made the referral to. Your Honor. There was no. . . As I read this, Severi didn't advise or report to Isaac as a client. He was a part of the underlying litigation. He was a lead counsel. But he never took instructions from Isaac. He never entered into a fee agreement with Isaac. Is that. . . He did not enter into a fee agreement. He did enter into a fee agreement while he was at Leif. When he moved. . . And you were paid for the referral to Leif. You were paid for all the work he did while he was with Leif. So you received your. . . I don't mean to cut you off. And you're very patient. But you received. . . You did receive that payment from Leif. Yes. But if he had stayed there, Your Honor. You've raised all these equitable theories of recovery of quantum merit and unjust enrichment and the like. And I don't see the equitable component to your claim, in part for the very reasons that Judge Duncan has pinpointed. But it seems to me what you want, and it's an irony that you bring these under equitable doctrines, but you're trying to get paid for work you didn't do. And you're trying to get paid for a referral you didn't make. Because Mr. Savarini represented Breen, and you never referred him. You got paid for the person you referred, and that's all you were entitled to is the $2.5 million for that referral fee. But what you're not entitled to is to take an attorney fee from the Savarini law firm for representing Mr. Breen, whom you didn't even refer. That was a different kind of thing. And he did all the work on it in representing Mr. Breen. And then you're trying to essentially reap the benefits of Mr. Savarini's work. That's not equitable. In response, Your Honor, Mr. Savarini, if they filed a notice of appearance on behalf of another client, why should that change the situation? It wasn't Breen that got him the lead counsel position. It was the fact that we referred Isaac Industries to him while he was at LEAF, and then he decided to move firms. In his own words, I just continued doing what I was doing at LEAF at my new firm. But somebody else, as you point out, was doing it at LEAF as well, right? So you were getting paid by LEAF because there was work being done at LEAF, was there not? Yes. Okay, so you want double. You would be getting paid for work from two firms. You want to follow. You don't want to just follow him. You want both. In fact, Your Honor, to be full disclosure, it's more than that. We referred Isaac Industries to Berger Montague and received a fee. But they had an agreement. It's not uncommon in these cases to get more than one referral from these firms. I do understand. And so it wasn't Breen, who was already a client in that case, that got him that lead position. It was the fact that he was lead at LEAF on our client, and then he moved over, and because of that situation was the only reason why he got lead position at his new firm. It wasn't because of Breen. He could have filed notice of appearances on three other clients. It didn't matter. He didn't cite Breen to the court. It's very rare for a firm to become lead counsel in the middle of the case. The only reason why he did in the middle of the case was because he was lead counsel at LEAF. And why was he lead counsel at LEAF? Because we referred him Isaac Industries. So do you follow him for the rest of his career? If we refer a client, and that lawyer could just become lead, and then two weeks later move to another firm and become lead and say, sorry, I represent somebody else. I'm not paying you a dime, and then racks up all those fees. But where does it stop? It stops? He represented another client. He really didn't represent another client. That's very important here. He filed a notice of appearance on a client that had been in the case for over a year or two. He filed a pro hoc motion for Haley Paint. So why are we talking about Haley Paint? It's irrelevant, the fact that he filed a notice of appearance. Would you have prevented him from being lead counsel? We would have raised it. I know, but as I read your papers, you seem to say you would have raised it, but you would have lost that. I don't know. What would have happened? Well, that's your only part of consideration. Well, the consideration, again, Your Honor, goes back to the fact that he did not want to rock the boat. That's common in these cases. We don't want to go in front of the judge with these fee issues. It happens a lot. And so Mr. Severi knew that. And you didn't want to rock the boat either. We don't want to rock the boat, but we're the ones who say, if you're going to move from LEAF and take $10 million away. But you didn't. You kept the work. You kept work at LEAF. You kept the work that was done at LEAF. After he left LEAF, he racked up a load star of $10 million in a year. That would have been the same amount that he would have done at LEAF. That's not a dispute. And we would have gotten a referral fee. So why does the fact that he filed a notice of appearance on behalf of another client, who's not his client, he didn't bring this client. No contract. I'm sorry, Your Honor. No contract. He had no agreement with you. And it does seem, to inherit what Judge Wilkinson was saying, it seems singularly inequitable that he did this work, and yet you're a client you didn't refer, and work you didn't do for LEAF is work you continue to get for LEAF. The only reason in the record why he got to do that work, why he was LEAF. Thank you, sir. I'm sorry, Your Honor. Thank you. And I'm sorry, you were answering my question, and I would be happy to hear from you on rebuttal. I'm sorry if I cut you off. In rebuttal?  At Judge Wilkinson's, perhaps. Do you want to hear the answer now? Quickly, if you don't mind. Can you ask your question again, Your Honor? Yes. Well, I'm not sure I remember now. The problem that I'm having with your argument, because you don't have, you have to go on and imply contracts. And I'm having difficulty seeing how the conduct implies a contract, and I'm also having trouble finding equitable considerations for the contract. And perhaps you might want to ponder that and start with that on rebuttal, if that's okay. Yes, Your Honor. Thank you. Thank you. Mr. Ehrlich, I'm pleased to hear from you. Thank you, Your Honor. May it please the Court. Good morning. Good afternoon. My name is James Ehrlich. It's my privilege to represent Joseph Saveri and the law firm of Joseph Saveri. And there are at least four reasons to affirm the decision of the district court granting summary judgment for Mr. Saveri and his firm.  blatantly and flagrantly unethical, and in violation of the professional conduct rules of three states, and certainly of the state of Maryland, which all parties agreed applied here. Second, the equitable claims, quantum merit, unjust enrichment, money had and received, all fail for the simple reason that Criden & Love has already been paid more than three times the value of its services that they themselves set. Third, the remaining claim, which is the fraud claim or the implied contract claim, are legal claims. They are unenforceable because of the violation of the bar rules, and they're utterly meritless in any event. And third, and I guess finally fourth, as the district court held, the Saveri law firm was paid only for work after Mr. Saveri left Leaf Cabrasier and began working for a different client than the client that Criden & Love represents, the Green client. Although Mr. Saveri at some point could have just said no when any of these not subtle comments were made about the continuation of the relationship. You're right, Your Honor, he could have. But in our view, he didn't have to because he never accepted it. Yeah. And let me just jump, I was going to start with the ethical issue, but let me just jump to the issue of whether there is even a contract here. There is not and there has never been a valid contract claim. Can I ask you a question about these contracts? Because you may not know a lot about them, but you know a whole lot more than I do. Are they typically in writing? Referral fee contracts? Yes. They're required to be. Right. Okay. Under the laws of numerous states, including Maryland, including California, including Florida. And the other agreements in this case that are floating around this case were in writing? There was an e-mail to Leif Cabrasier. If that satisfies as a writing, there was an e-mail. But there wasn't a referral fee agreement with Leif Cabrasier. It was in an e-mail. All there was was an e-mail between Leif Cabrasier, a partner by the name of, I think, Fastiv, and Mr. Love. And that e-mail exchange, very brief, it's in the record, and it simply says, we would like to refer you to this client. We expect you to pay us a 12.5% referral fee. The Leif Cabrasier attorney writes back, agreed. Yeah. And he writes back and says, yes? He says, agreed. Agreed. Okay. Sounds like a contract. Well, it is. It doesn't satisfy the rules of professional conduct. I understand, but we're talking about just a contract. Right. Just a contract, there was an offer and acceptance in that particular case. Okay. And, in fact, Leif Cabrasier paid that. Okay. Now we're talking about this. This one, there is no offer. Well, there is an offer, I guess. There is absolutely no acceptance. The appellants concede that there is no express acceptance by letter, in writing, or orally. Their argument is. That's why we have all these quasi-contractual theories. Correct. Because they grow out of the fact that there was no acceptance. Correct. If there had been anything resembling an acceptance, we wouldn't need to rush out to quasi-contract. Exactly right, Your Honor. Was there a referral agreement between Crichton and B&M? Do you know? Berg and Montag? Yeah. I don't know. Whether there's one in writing, I don't know. But I do know that Berg and Montag paid the referral fee. So, from Berg and Montag's standpoint, they were satisfied, I guess. So we move from the contract claims to the implied, the equitable claims. Talk to us about that. Well, the equitable claims failed me for a whole variety of reasons. Number one, when you look at a quantum merit claim, in quantum merit under California law, and all the parties agree California law applies to substantive claims. Under California law, your quantum merit claim is for the reasonable value of the services that you perform. The reasonable value of the services that were performed by Crichton and Love were established in the case where they actually applied to have their legal fees paid. They applied to Judge Bennett and said, we have $800,000 worth of fees that we billed here at $850 an hour. What services were performed other than the referral of Isaac? They claimed fees in the class action, which they said, we helped do document review, we helped to prepare our client for depositions, and so forth. But they had some tasks that they were assigned in the case of the class action. They performed them, they billed for it, and they were paid for it. $850 an hour? One of the lawyers was billing at $850 an hour. Mr. Love's fee was $650 an hour. And they had associates who worked as well. Other than those particular tasks and the referral of Isaac. That's it. There was no uncompensated work. Correct. Exactly right. Not only not uncompensated, they were paid, when you add in the Berger-Montague fee, referral fee, and the Leif-Gerbrasier fee, they were paid over $2.5 million for $800,000 worth of work. So on what theory do they get to come in and say, we want another million dollars, $1.2 million actually, from Mr. Saveri to become even more overcompensated than they already are? Well, Mr. Saveri, in truth, is not clothed with such good intentions either. I mean, he could have said no. He could have been clear. Yes. And one reads the record, it seems like he was intentionally unclear. I mean, both of them are honest with respect to these conversations. But he didn't want the boat to be rocked. He said what he said, and it's in the record. And he wanted to be lead counsel. Right. He wanted to be lead counsel. So it was in his best interest to be slightly ambivalent. But he made the fair point. It's a fair point. He didn't have an obligation to be clear. And not only that, but after the plaintiffs imply that if you're going to ride the coattails of our client, then you should pay me something, that's when he goes out and he enters his appearance on behalf of a different client, which when they were deposed and asked, well, what does that mean? Well, they said, I don't see any other explanation that we can give that that means a rejection of our offer. Well, both parties sort of thought it was fair. They said that in deposition? Yes. There were depositions taken in this case? There were. The case was fully discovered in California. And to be fair to Mr. Love and his partner, what they said was, sitting here today, that's the only explanation I can give. Well, if it's the only explanation for it, then whether it's today or yesterday, it's the only explanation for it. And they said, well, maybe we didn't notice it was filed. But it was filed on the ECF, notice of appearance. It was filed within a matter of days after the conversation. The entry of appearance on behalf of Green was filed on June 1. And Mr. Saveri, nobody remembers exactly what the date was in May, though. Right. You know, they're both fairly sophisticated parties, and they're both negotiating on fairly even terms, and they're both negotiating on even terms. They both could have made things clearer. I don't think that all the sins of omission lie with one party or the other. And it's ‑‑ I think we've probably chewed the bone pretty thoroughly in exploring the issues that we have. Well, I'm going to ask at this point whether my colleagues have any further questions. I believe they do. I'm fine, thanks. I'll be happy to rest on our wreaths. I think we're just fine. Thank you. Thank you, Your Honor. Mr. Lowe. Thank you, Your Honor. Mr. Saveri's argument in summary judgment was that they rejected our offer by filing a notice of appearance for Green. That was their argument, and that was what was accepted by the judge. We would argue that filing a notice for a client that's already in the case, it would be reasonable for Pride and Love not to interpret that as a rejection of our offer. As for the acceptance, they filed a motion for lead counsel while representing our client. Not only did they do that, but they represented to the court that Pride and Love supported the motion and that Isaac Industries supported the motion. We had no reason to think that he wasn't going to pay. As Judge Wilkinson said, yes, we could have been clear, we're sophisticated parties, and maybe we should have, but we had no reason to think otherwise. Except that you kept raising it. It's interesting, it kept resurfacing. The questions kept resurfacing. That's why there seems to have been, on both sides, a little calculated lack of clarity. We filed an email, I think you're referring to, after he became lead counsel and said, please confirm it, because it was unusual for us. We've never had one of these where it was by conduct as opposed to writing. So it was normal for us. But as to the fact that he was silent in the face of that, so was Berger-Montague. Many of our referrals... Well, you already had an agreement with Berger-Montague when you sent the reminder email. Yes, but nonetheless, we were used to the fact that law firms generally don't pay attention to our reminder emails, and yet at the end of the day, they pay the referral fees, just like Berger-Montague. And here he didn't. Well, they had an agreement. We could go around on that again, but the reminder was in the context of a pre-existing agreement. You'd be surprised of the firms that even when we have written agreements, will try to weasel their way out of the referral fees four or five years later when the case comes in. No, I probably wouldn't be surprised at all. Again, this is a summary judgment, Your Honor. And their whole argument was that this notice of appearance was a rejection, and our side was that following the motion was acceptance. We don't think summary judgment would be appropriate when obviously either one, the jury could find that one or the other was acceptable. It seems like summary judgment was made for just this kind of case. We would respectively disagree. Where you don't have a contract, where you could have gotten a contract, where there's absolutely no acceptance, where you're trying to get paid for work you didn't do. If summary judgment isn't meant for this sort of case, I question what utility it has. I mean, I don't want to repeat myself, Your Honor, but we just think that the facts underlying the rejection, the acceptance, could be interpreted differently by a jury. And as for the unjust enrichment, Your Honor seems focused on the fact that the referral, that we didn't do anything. I would ask the court to take a look at the Crockett case in the Ninth Circuit because they're the ones who looked at this referral fee idea the closest, where the district judge kept saying, you got paid. What do you want extra? And it went up and they reversed. They said, no, you need to give value to this referral. Otherwise, it wouldn't have been done. There must have been some value to this referral. And the district court, again, didn't do it and it went back up in the Ninth Circuit. It's a hard time accepting that $2.5 million doesn't constitute value. Of course, Your Honor. I'm not going to say that we weren't well paid in the case, but that's not an excuse not to get paid what we deserve fully from the case. The fact that we worked and got paid for it and that we got two other firms into the case and that they made their money because they wrote our client and that we had to take care of them, does not mean that we should be penalized for the third firm that also made money. They made their money because they represented Mr. Breen, who is the lead counsel and the lead plaintiff in the antitrust class action, and they represented someone as lead counsel whom you did not refer. You referred Mr. Issa. You got paid by C&L or you got paid for referring Mr. Issa. You did not refer Mr. Breen, and it's his representation of Mr. Breen for which he was compensated. Again, respectfully, Your Honor, Mr. Breen, it's not a Mr. Breen, it's a company, but Breen was not the reason why Severi at his new law firm became lead counsel and was able to do that work. The fact that they filed a notice of appearance on some other client, they did as much work for Breen as they did for Isaac Industries. There's nothing in the record that suggests otherwise. I mean, that's the crux of the case, is that this whole thing was somewhat of a ruse of filing a notice of appearance for another client in the hopes in a couple years later to say, we rejected your offer, didn't you see that? And we represented Breen. They did nothing in addition to representing Breen that they didn't do representing Isaac Industries. There are no further questions. I think we've been over it. If you have any final concluding sentences, that's fine. I would suggest that we heard both of you out and that we understand your arguments and understand what you put before us in the briefs. Your Honor, I agree with you that I think it's been talked out, and if you have no further questions, thank you for your time. Thank you. We'll adjourn court and come down to do counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Allyson K. Duncan